IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

JONATHAN TINN, an individual,

        Plaintiff,

v.

EMM LABS, INCORPORATED, a Canada corporation,

        Defendant.

Civ. No. 07-963-AC

OPINION AND ORDER

ACOSTA, Magistrate Judge:

*Introduction*

Currently before the court are three motions filed by Plaintiff: (1) Plaintiff's Motion to Disqualify Michael Greene; (2) Plaintiff's Motion to Remove "Counsel Eyes Only" Restriction from

1

Document Nos. EMM-INV00001-0395 and EMM-00616-1114; and (3) Plaintiff's Motion to Compel Production of Documents. This order will dispose of all three motions, taking each in turn.

*Background*

Jonathan Tinn ("Tinn") asserts breach of contract and misrepresentation claims against EMM Labs, Inc. ("EMM"). EMM is a Canadian company that designs and manufactures high-end audio equipment. Tinn claims that his negotiations with EMM created an oral contract for certain distribution rights and for discounts on EMM products. Tinn previously filed a motion to compel, which the court granted, and EMM requested and received a protective order regarding certain of the information the court ordered it to produce.

*Motion to Disqualify*

Tinn moves to disqualify attorney Michael Greene ("Greene") from acting as a witness for EMM and to prevent him from communicating with EMM and its counsel on matters related to this lawsuit. Tinn alleges that, during the negotiations in question, Greene acted as his lawyer. He argues that Greene has disclosed and continues to disclose confidential information to EMM in violation of his duties to Tinn as his attorney.

1. Greene was not Tinn's attorney during contract negotiations with EMM.

First, the court must address whether an attorney-client relationship existed between Tinn and Greene. The court recognizes that there need not be an express written or oral contract and that an attorney-client relationship can be inferred by the conduct of the parties. *Kidney Ass'n of Oregon v. Ferguson*, 315 Or. 135, 146 (1992). Similarly, there need not be payment of fees to establish the existence of an attorney-client relationship. *Id.* In Oregon, an implied attorney-client relationship is established where "the putative client [holds] a subjective belief that the relationships exists,

2

coupled with an objectively reasonable basis for the belief." *Admiral Ins. Co. v. Mason, Bruce & Girard, Inc.*, 2002 WL 31972159, *1 (D. Or. Dec. 5, 2002) (citing *In re Wittemyer*, 328 Or. 448, 456 (1999)). The lawyer's subjective understanding is irrelevant and the objectively reasonable basis is evaluated in light of the attorney's conduct. *Id.* at *1-*2. "The *evidence must show* that the lawyer understood or should have understood that the relationship existed, or acted as though the lawyer was providing professional assistance or advice on behalf of the putative client." *In re Weidner*, 310 Or. 757, 770 (1990) (emphasis added). In sum, having established a subjective belief, the putative client must also show through objective evidence that the lawyer gave him or her a reasonable basis upon which to base this subjective belief.

In *Philin Corp. v. Westhood, Inc.*, 2005 WL 582695 (D. Or. 2005), Judge Hubel found that the putative client's declarations established his subjective belief in the existence of an attorney-client relationship, thus satisfying the subjective element. The putative client and attorney had met several years earlier, and after that single meeting the putative client believed that the attorney would represent him, while the attorney did not think he had been engaged in any capacity. Subsequently, the two exchanged e-mails during the course of which the attorney wrote that he would need to run "an updated conflict check," discussed his hourly rate, and mentioned the creation of a retainer agreement. *Id.* at *11. Later, the attorney conceded that he had given legal advice to the putative client years earlier, that he had "discussed possible litigation against [the putative client]'s family corporation and specifically discussed asset protection," as well as "appropriate terms of engagement." *Id.* Taken together, "these facts provide[d] the requisite objective basis for [the putative client]'s subjective belief about the existence of an attorney-client relationship." *Id.*

In an earlier case, also in this district, Judge Haggerty found that the putative client

3

"subjectively believed that he and [the lawyer] shared an attorney-client relationship." *Admiral Ins. Co.*, 2002 WL 31972159, at *2. With regard to the putative client's objective basis, Judge Haggerty wrote:

> An objective basis for the existence of an attorney-client relationship is established through the agreed-upon facts. [The lawyer] should have known that an attorney-client relationship existed after he engaged in discussions with the vice-president, director, and shareholder of a closely-held corporation about potential litigation that could seriously impair the financial well-being of [the putative clients].

*Id.* The parties agreed on the core fact that they had several conversations regarding the litigation at issue. Also, the putative client's allegation that the lawyer claimed to have entered him into the firm's conflict system was unchallenged. *Id.* Under these facts, the court recognized an attorney-client relationship.

In the present matter, Tinn, the putative client, had a subjective belief in the existence of an attorney-client relationship between himself and Greene. (Tinn Declaration ("Decl.") 1.) ("Michael Greene has been my attorney in matters adverse to [EMM] and has confidential information about me as a result of our attorney-client relationship that he can use against my interests by revealing that information to EMM.") Thus, the subjective prong is satisfied. However, Tinn has not produced evidence sufficient to satisfy the requirement of an objectively reasonable basis in support of this belief.

Notably, Tinn has produced no written agreement, correspondence, e-mails, or other similar tangible indicia that would support a reasonable conclusion that Greene had agreed to act as Tinn's attorney. Tinn's only evidence are the declarations of two individuals, William Eichengrun ("Eichengrun") and Michael Lavigne ("Lavigne"), who claim to have heard parts of phone

conversations between Tinn and Greene. Eichengrun stated that "Greene told [him] that he was helping Tinn in contract negotiations with [EMM], as Tinn's attorney," and that he had given Tinn legal advice on his divorce and helped him find a local lawyer. (Eichengrun Decl. 1-2.) Lavigne recalled three-way phone conversations between Tinn, Greene, and himself. Lavigne stated that he was excused from these conversations when "Greene and Tinn said they were about to discuss . . . legal issues in a more specific way that needed to be confidential." (Lavigne Decl. 2.) According to Lavigne these legal discussions involved both Tinn's divorce and Tinn's relationship with EMM. Neither declaration provides detail or context regarding these conversations, and both declarations are short: the content of Eichengrun's declaration is barely one-half page in length and Lavigne's is one page long.

Greene disputes these characterizations in an eight-page declaration that is detailed and specific regarding his conversations with Tinn, including those conversations in which Eichengrun and Lavigne participated. Significantly, Greene states, and Tinn neither disputes nor offers contrary evidence, that he gave up the practice of law twenty-five years earlier and began a career in real estate development, and that for the past seven years he has functioned as a consultant for a company that consults with small companies about branding and strategic vision, marketing, organization, and related issues. (Greene Decl. ¶ 3.) Furthermore, Greene, who never practiced divorce law, expressly denied that he provided Tinn with legal advice about Tinn's divorce, but instead specifically advised Tinn to retain an attorney in that matter. (Greene Decl. ¶¶ 9, 10.) And, soon after Tinn introduced Greene to EMM, Greene signed a consulting agreement with EMM, an arrangement of which Tinn was aware (Greene Decl. ¶¶ 11, 14.) and did not object. (Tinn Decl. ¶ 8.).

EMM's co-founder and CFO, Susan Meitner, confirms in her declaration that EMM hired

5

Greene in part to consult on legal issues related to business and management issues. (Meitner Decl. ¶ 9.) Meitner also stated that Greene acted as a liaison between EMM and its outside attorneys. (Meitner Decl. ¶ 10.) EMM also entered into a written contract with Greene and paid him by the hour. (Meitner Decl. ¶¶ 8, 11.) Meitner's and Greene's statements, coupled with the lack corroborating objective evidence and the absence of specificity in the Eichengrun and Lavigne declarations, preclude a sufficient evidentiary basis for Tinn's objectively reasonable belief.

Furthermore, there is no evidence that Tinn compensated Greene for his legal services. The court recognizes that while payment of fees is not necessary to prove an attorney-client relationship, its absence does not weigh in Tinn's favor. Although Tinn claims that in return for legal services he gave Greene discounts on audio equipment, he has not established this fact beyond its bare assertion, by producing purchase orders, e-mails, shipping documents, or even identification of the specific equipment for which these discounts were given. Second, Tinn maintains that Greene represented him previously both in his divorce and in conflicts with other manufacturers, but he again provides not a single piece of evidence to support the existence of these prior representations.

Without more, Tinn cannot overcome the bulk of the evidence suggesting that Greene was not his attorney. It is undisputed that, at the time of the negotiations, Greene was on EMM's payroll. It is difficult to conceive that a reasonable person in Tinn's position would overlook this fundamental fact and conclude that Greene was representing his interests against the very entity who was paying his, Greene's, salary. At the very least, it undermines the objective reasonableness of Tinn's belief that Greene was acting as his attorney.

In conclusion, the evidence is insufficient to create an objective basis for Tinn's subjective belief. The court cannot conclude that Greene and Tinn shared an attorney-client relationship.

2. Greene was EMM's lawyer during contract negotiations with Tinn.

Like Tinn, EMM has expressed its subjective belief that Greene was acting as its attorney during contract negotiations with Tinn. Like Tinn, EMM knew that Greene was an attorney, i.e., that Greene had graduated from law school, been licensed to practice law, and had actually practiced law. However, unlike Tinn, EMM can produce an evidentiary basis for an objectively reasonable belief that Greene was its attorney.

The contract between Greene and EMM states, under "SCOPE": "[Greene] is experienced in providing legal, business, and management consulting services for individuals and companies. [EMM] engages [Greene] to provide services to [EMM] on an as needed basis including but not limited to the contract with 'On A Higher Note'." (Meitner Decl. Exhibit ("Ex.") A.) The construction of this clause places "legal" firmly in the category of the "services" that Greene was hired to provide. The agreement further states, "[Greene] shall provide services as reasonably required to represent [EMM]." *Id.* On its face, the agreement demonstrates that EMM intended to engage Greene, in part, to provide legal services. The contract also states that Greene would be compensated at a rate of $375.00 per hour, providing another piece of objective evidence to support EMM's contention that Greene was representing EMM in the negotiations, not Tinn. For these reasons, EMM has established that an attorney client relationship existed between Greene and EMM during the contract negotiations with Tinn.

3. Privileged Communications.

It follows that, first, Tinn's communications with Greene during the negotiations are not protected. Second, Greene owes no fiduciary duties to Tinn arising from an attorney-client relationship. Third, EMM's communications with Greene during the negotiations are protected and

7

Greene can continue to communicate and work with EMM in the present litigation. Fourth, and finally, Greene need not disclose what information he gave EMM regarding communications with Tinn because they are not protected.

*Motion to Remove "CONFIDENTIAL - COUNSEL EYES ONLY" Designation*

This motion concerns two documents produced by EMM, as specified above, that are subject to a stipulated protective order. The order was filed on January 24, 2008, and designated these documents "CONFIDENTIAL-COUNSEL EYES ONLY." According to the protective order, information that is so designated is "confidential information which is of an extremely sensitive nature and which might cause significant competitive harm to a party, or competitive or other harm to a person not a party to this litigation, if disclosed to the disclosing party's competitors or others." (Stipulated Protective Order 3.) Where there is a dispute as to the proper designation a document has received, "the designating party seeking to preserve the confidentiality of any such document must make the showing required by Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 26 and *Foltz v. State Farm Mutual Ins. Co., supra*, in order to maintain the secrecy of such document." *Id.* at 8-9.

Fed. R. Civ. P. 26 states in relevant part: "The court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including . . . requiring that a trade secret or other confidential research, development, or commercial information not be revealed or be revealed only in a specific way." Fed. R. Civ. P. 26(c). In order to maintain a protective order, a party must be able to show "for each particular document it seeks to protect . . . that specific prejudice or harm will result if no protective order is granted." *Foltz v. State Farm Mutual Auto. Ins. Co.*, 331 F.3d 1122, 1130 (9th Cir. 2003). However, "[b]road allegations of harm, unsubstantiated by specific examples or articulated reasoning, do not satisfy the

8

Rule 26(c) test." *Beckman Indus. v. International Ins. Co.*, 966 F.2d 470, 476 (9th Cir. 1992) (quoting *Cipollone v. Liggett Group, Inc.*, 785 F.2d 1108, 1121 (3rd Cir. 1986)). If EMM meets this burden, the heightened protection will remain in place.

EMM argues that the protective order is necessary to prevent significant competitive harm. First, the documents contain sensitive pricing information. EMM's pricing is variable, that is, EMM charges different dealers different prices depending on their negotiated agreement. This information meets the standard articulated by the protective order: it "might cause significant competitive harm" to EMM "if disclosed to [EMM's] competitors or others." This standard applies regardless of the likelihood of an improper disclosure. Rather, it is the content of the information that determines the level of protection.

Disclosure to a competitor, like Tinn himself, could significantly harm EMM if Tinn or another competitor used the information to undercut EMM's pricing. Disclosure to others, dealers for example, could also cause significant harm because dealers would demand the lowest price, depriving EMM of the benefits initially bargained for. This disclosure could also put the relationships between EMM and its dealers at risk.

Tinn argues that he needs personal access to the documents in order to fully evaluate his damages. He also claims that he must personally verify that all relevant sales have been accurately captured and recorded. However, Tinn is a direct competitor of EMM in a small, very competitive market. Until recently, Tinn's websites stated that they sold EMM's equipment. As of this writing, however, the sites identify EMM equipment as "products we used to carry that we feel have been bettered both sonically and at their price points." *See Chambers Audio*, http://www.chambersaudio.com/lines.html (last visited April 28, 2008); *see also Blue Light Audio,*

http://www.bluelight audio.com/lines.html, (last visited April 28, 2008). EMM has also produced declarations from representatives of two other high-end audio equipment manufacturers, Jena Labs and Von Schweikert Audio, who allege that Tinn misappropriated and misused sensitive proprietary information in the past. (Defendant's ("Def.'s") Memorandum ("Mem.") in Opposition ("Opp.") 4.) For these reasons, the court concludes that disclosure of this confidential information to Tinn at this time would pose too great a risk to EMM, and lifting the protective order is not justified.

Therefore, the court denies Tinn's motion to remove the "CONFIDENTIAL-COUNSEL EYES ONLY" designation from the specified documents, but without prejudice to Tinn's ability to renew his motion in the future. However, given the nature of Tinn's alleged damages, he is entitled to the information he seeks in some form. Therefore, the court orders EMM to produce an accurate summary of its sales during the relevant periods. EMM must summarize, by month and year, records of domestic sales prior to February 5, 2007, and records of international sales prior to October 13, 2006, beginning with Tinn's November 2005 hire. Additionally, for each unit sold, EMM must indicate whether the sale was to a distributor, a dealer, or an end user. Finally, EMM must also designate the sale as either domestic or international.

*Motion to Compel Production of Documents*

Tinn moves to compel production of an email originally produced by Andreas Koch ("Koch"). EMM claims that the disclosure was inadvertent, the content is privileged, and that EMM is entitled to retrieve the document. The court must determine, first, whether the document was privileged and, second, if it was privileged, whether its disclosure amounted to a waiver of that privilege.

Attorney-client privilege is governed by Rule 503 of the Oregon Evidence Code ("Rule

503"). This privilege protects communications not only between the lawyer and the client, but also those between the lawyer and the client's representative. Rule 503(2)(a). A client's representative is defined as "a principal, an employee, an officer or a director of the client." Communications between a representative and the lawyer are protected to the extent that the representative is giving the lawyer information "that was acquired during the course of, or as a result of, such person's relationship with the client" or is receiving advice from the lawyer "as part of such person's relationship with the client." Rule 503(1)(d).

Because Koch was, at the time in question, a Vice President of EMM, he qualifies as a client representative for purposes of the attorney-client privilege. Koch carries the title of Vice President, his duties were consistent with those of a Vice President, he signed agreements on behalf of EMM as its Vice President, and he identified himself as such in a declaration he signed on Tinn's behalf. Tinn now disputes this status, claiming that Koch is really an independent contractor and, therefore, not entitled to the privilege, but the record contains ample factual foundation on which to conclude that Koch was, at the times material to the instant issue, an "officer" within the meaning of Rule 503.

Furthermore, Koch's status as an independent contractor would not destroy the privilege. He need not be both an officer and an employee; he need only be one of them to trigger the privilege. The text of the statute is unambiguous, conferring representative status on officers and employees equally and exclusive of the other. *See Portland General Electric v. Bureau of Labor and Industries*, 317 Or. 606, 610 (1993) ("In this first level of analysis, the text of the statutory provision itself is the starting point for interpretation and is the best evidence of the legislature's intent.") Therefore, Koch is within the scope of the attorney-client privilege and his receipt of the email does not destroy this privilege.

11

Next, the court must address whether, as Tinn claims, disclosure of the email waives the attorney-client privilege. Generally, a document's disclosure waives the party's entitlement to the protections of the attorney-client privilege, with respect to that document. However, "[a] court need not necessarily conclude that the lawyer-client privilege has been waived when a document has been produced during discovery. Factors to be considered by the court may be whether the disclosure was inadvertent, whether any attempt was made to remedy any error promptly, and whether preservation of the privilege will occasion unfairness to the opponent." *Goldsborough v. Eagle Crest Partners*, 314 Ore. 336, 342-343 (Or. 1992) (*citing* McCormick, Evidence 342-43, § 93 (4th ed 1992)).

In a letter, dated January 1, 2008, EMM asked Koch to return any privileged materials arising from his employment with EMM. (Rubin Decl. Ex. 2, p. 2.) On January 24, 2008, the day before his deposition Koch produced the email "on a disk containing approximately 3,500 e-mails." (Def.'s Mem. in Opp. 4 (citing Rubin Decl. ¶3).) At the deposition, when Tinn's counsel attempted to offer it in evidence, EMM immediately objected and asserted the attorney-client privilege. The factual conditions surrounding the waiver suggest that it was truly inadvertent and, therefore, Tinn's motion to compel production is denied.

//
//
//

### *Conclusion*

For the reasons stated, Plaintiff's motion to disqualify (#35) is DENIED, Plaintiff's motion to remove "CONFIDENTIAL-COUNSEL EYES ONLY" designation (#44) is DENIED in part and GRANTED in part, and Plaintiff's motion to compel production of the specific email (#51) is

DENIED. The court further orders that Defendant is to produce the above-described summary of sales to Plaintiff on or before May 19, 2008.

IT IS SO ORDERED.

Dated this 29th day of April, 2008.

　　　　　　　　　　　　　　　　　　／s／
　　　　　　　　　　　　　　　　　JOHN V. ACOSTA
　　　　　　　　　　　　　　　　　United States Magistrate Judge