FILED

FEB 2 7 2009

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

JONATHAN TINN, an individual,

                  Plaintiff,

      v.

EMM LABS, INCORPORATED, a Canada
corporation,

                  Defendant.

Civ. No. 07-963-AC

OPINION
AND ORDER

ACOSTA, Magistrate Judge

*Introduction*

    Three motions are before the court for decision. Plaintiff Jonathan Tinn ("Tinn") has filed

for partial summary judgment against Defendant EMM Labs, Incorporated ("EMM") on the liability

OPINION AND ORDER                 1                 {KPR}

element of his claim for breach of oral agreement, and for summary judgment on EMM's counterclaim for violation of the Lanham Act. EMM has filed for summary judgment against Tinn on his breach of oral agreement claim or, in the alternative, for an order precluding Tinn from recovering damages for future profits and profits on sales not actually made. Tinn also has moved to amend his complaint for the third time, to add to his current allegations a charge that EMM agreed to manufacture and ship a specific product for Tinn to market and sell.

The court grants EMM's motion for summary judgment against Tinn's breach of oral agreement claim because Tinn has not presented evidence sufficient to permit a reasonable juror to conclude that the parties reached a meeting of the minds on specific terms. Consequently, the court denies Tinn's motion for partial summary judgment on liability and denies as moot EMM's alternative motion for an order precluding Tinn from recovering damages for future profits and profits on sales not actually made. However, the court will permit Tinn to proceed on a quantum meruit theory to recover the compensation, if any, EMM did not pay him for the services and sales he actually performed for EMM's benefit during the period of their business relationship. The court also grants Tinn's motion for summary judgment against EMM's Lanham Act counterclaim as to EMM's allegation of false advertising but denies the motion as to EMM's allegation of false association, because genuine issues of material fact exist regarding Tinn's use of EMM's name in the period after the parties' relationship ended. The court denies Tinn's motion to amend his complaint as untimely.[1]

---

[1] The parties have consented to jurisdiction by magistrate judge pursuant to 28 U.S.C. § 636(c)(1).

OPINION AND ORDER                    2                    {KPR}

*Factual Background*

<u>1.</u>    <u>The relationship between Tinn and EMM</u>

EMM is a manufacturer of high-end digital audio equipment. Prior to the events giving rise to this lawsuit, in approximately 2003, Tinn distributed EMM products. The parties' initial relationship ceased and EMM then contracted with On a Higher Note ("OAHN") for exclusive domestic distribution of EMM products. At least partially due to dissatisfaction with OAHN, in September 2005 EMM contacted Tinn to inquire whether he would resume selling EMM products. Susan Meitner ("Meitner"), co-founder of EMM and then its Chief Financial Officer, wrote an e-mail to Tinn that stated, in part: "I wanted to know if there was some way that we can work you into becoming a salesperson on behalf of EMM . . . ." (Meitner Declaration ("Decl.") Ex. 6.) In response, Tinn wrote: "I do not really understand what you mean by a 'salesperson' and what that would entail." *Id.* Tinn indicated his interest in a more extensive business relationship with EMM. The parties' discussions continued into October 2005 and ultimately resulted in Tinn beginning work for EMM in November 2005. During these discussions, both parties expressed their desire to enter into a written contract although no written agreement had been drafted or signed at the time Tinn began working for EMM.

In early November 2005, EMM instructed its lawyer to draft a written distribution agreement between itself and Tinn. On November 14, 2005, EMM received this written draft agreement from its lawyer but, apparently, did not then forward it to Tinn. In January 2006, EMM terminated its relationship with OAHN as EMM's exclusive domestic distributor and "Tinn began to distribute EMM products in the U.S. . . ." (Meitner Decl. ¶ 12.) Also in January 2006, EMM announced its new relationship with Tinn in press releases: "EMM Labs said Tuesday that it had named Jonathan

Tinn vice president of sales and marketing. Tinn, who formerly served as the company's domestic distributor of consumer products, will oversee both distribution and customer service worldwide, effective immediately," and "Both US distribution and customer service worldwide will be handled by Jonathan Tinn, EMM Labs' new vice president of sales and marketing." (Barton Decl., Exhibit ("Ex.") 2,4.) A few months later, in April 2006, EMM and Tinn had a "pricing dispute." (Weiss Decl. Ex. 2 at 2.) Although Tinn's response effectively was "I quit," he continued to perform his duties as a vice president of EMM.

In April 2006, EMM sent Tinn a draft agreement intended to govern their new business relationship. This was the first written draft agreement that Tinn received and was substantially similar to the November 2005 original draft agreement EMM had received from its lawyer. Over the next eight months the parties exchanged at least eleven additional drafts of the agreement, none of which, apparently, adequately addressed Tinn's concerns or reflected the terms Tinn believed he had orally agreed to with EMM in October 2005. On November 21, 2006, Michael Greene ("Greene"), a lawyer working for EMM, e-mailed Tinn a draft agreement wherein Greene had attempted to "capture [Tinn's] concerns" with previous draft agreements. (Greene Decl. Ex. 13.)

On December 19, 2006, Meitner sent Tinn an e-mail in which she stated: "Right now due to the fact that we don't have a contract in place, I will need you to wire the money for the units for the customers and then I will send them out." (Meitner Decl. Ex. 3.) Tinn did not respond to this e-mail. On December 20, 2006, Meitner again e-mailed Tinn regarding product pricing. This e-mail stated: "This price for the two demo units is only for these two until we have a contract and agreement on pricing." (Meitner Decl. Ex. 4.) Again, Tinn did not respond to the e-mail. On January 5, 2007, Meitner again e-mailed Tinn, the e-mail stating, in relevant part: "At the present

time there is no written or verbal agreement with EMM Labs.  Until further notice from us we will accept orders from you on a non exclusive basis.  As is our normal business practice prepayment by wire must be received prior to shipment."  (Meitner Decl. Ex. 5.)

On January 30, 2007, Meitner e-mailed Tinn with an attached draft agreement.  The e-mail stated:

> This contract has been written and rewritten umpteen times and now we have to decide whether we will go forward or not.  It contains the standard provisions that EMM Labs needs to go forward.  Please let me know by tomorrow if this agreement is acceptable and if you want to proceed as our US distributor.

(Meitner Decl. Ex. 6.)  Tinn rejected this draft agreement and, "on February 5, 2007, [Meitner] wrote to advise him that EMM would manage its sales in house."  (Meitner Decl. ¶ 16.)  There is no dispute that "no written contract has ever been entered into between EMM and [Tinn]."  (Defendant's Concise Statement of Material Facts ("Def.'s CSMF") ¶ 19; Plaintiff's ("Pl.'s") Response CSMF ¶ 19.)

During his relationship with EMM, Tinn maintained two websites, bluelightaudio.com and chambersaudio.com, through which he sold audio products, including EMM products.  Following the termination of his relationship with EMM, Tinn continued to display references to EMM on these websites.  In April 2007, Meitner asked Tinn, via e-mail, to remove references to EMM from his website.  (Def.'s Opposition ("Opp.") Ex. 3 at 51.)  Tinn did not remove these references, however, until after EMM raised a counterclaim for false association and false advertising in an amended answer on April 15, 2008.  In the intervening year, Tinn received a number of e-mail inquiries from potential buyers of EMM products.  As to these inquiries, Tinn's deposition testimony and his contemporaneous e-mails demonstrate that he did not respond to some of these inquiries at all.

When Tinn did respond, he either did not clarify that he no longer represented and sold EMM products, unfavorably compared EMM products to other audio products, or steered the customer to a product line that he himself owned and distributed. (Conable Decl. Ex. 2 at 2-24; Ex. 3 at 51-66.)

2.    Tinn's testimony

    a.    May 19, 2008:  Response to Interrogatories

Tinn's May 19, 2008, response to EMM's April 14, 2008, interrogatories contains this description of the terms of the alleged contract:

> INTERROGATORY NO. 1:  Please set forth each term or provision of the Contract.
>
> ANSWER:  The terms are those contained in the draft agreement immediately preceding a June 28, 2006 e-mail from Susan Meitner to James Artiano with a copy to Andreas Koch, copy of which is in the possession of defendant's counsel, except that, as explained in plaintiff's proposed first amended complaint, plaintiff was defrauded by EMM into reducing the orally agreed upon amount of commission for international sales (10%), to 5% as reflected by that draft.

(Weiss Decl. Ex. 3 at 2-3.)

    b.    June 25, 2008:  Deposition

During his June 25, 2008, deposition, Tinn testified that, at some point, he had seen a written agreement containing the terms of his agreement with EMM. (Weiss Decl., Ex. 1 at 5.) Tinn also testified that he could recall from memory some, but not all, of the terms he agreed to with EMM. *Id.* at 6. As to the terms of the agreement that he allegedly entered into with EMM in October of 2005, *id.* at 24, Tinn testified that the agreement was for an initial two-year term, with renewals predicated on meeting sales quotas. The quotas themselves were dependent on EMM's ability to release and ship units of the CDSA, one of their products in development. Tinn was not sure of the term of the renewal, but believed it was for an additional two years. Tinn was also not sure if he

could recall the specific quotas for renewal, though he remembers that EMM "kept trying to renegotiate" the number. *Id.* at 11. Under the agreement, Tinn could only be terminated for committing a crime or failure to meet the sales thresholds that would trigger renewal. *Id.* at 14. On the issue of compensation, Tinn stated that he could not necessarily recall the compensation terms with complete accuracy. One term he was sure of was that he would receive a "50 percent margin" on products sold in the United States. *Id.* at 23. Tinn also stated that he required as a term of the agreement that Oregon law would apply to any disputes arising from the agreement. *Id.* at 18.

When asked to identify the point at which the oral agreement was reached, Tinn responded that it was sometime in late October or early November 2005, and that EMM had expressly agreed to all of his terms. Tinn testified that he was not aware of any written document that memorialized all the terms of his contract with EMM. *Id.* at 21-22. He also testified that he told EMM he "would only enter an agreement if [he] had an agreement in writing," *id.* at 27, and that EMM also intended to enter into a written agreement.

c.    *July 15, 2008: Amended Response to Interrogatories*

After his deposition Tinn amended his response to EMM's April 14, 2008, interrogatories. His amended answer to the first interrogatory stated: "On June 25, 2008, defendant EMM Labs, Inc., ("EMM") took the deposition of Jonathan Tinn. Tinn testified about the terms and provisions of his oral agreement with EMM. In accordance with Tinn's testimony, plaintiff amends his response to this interrogatory." Tinn then detailed several specific terms to the parties' alleged oral agreement.

First, the oral agreement was for a term of two years, after which automatic renewal would occur provided Tinn had met minimum sales thresholds, approximately 100 to 150 units of any EMM product. "The initial term of the agreement was two years beginning at the release of EMM's

CDSA product." (Weiss Dec. Ex. 6 at 3.) Second, any disputes would be resolved pursuant to Oregon law. Third, EMM was to make consistent product shipments to Tinn in order to facilitate his sales and meeting of said sales thresholds. Fourth, Tinn would make decisions regarding publications that would review EMM products, trade shows EMM would participate in, and dealers EMM would use, as well as assist in developing a new product. Fifth, and finally, the compensation terms for the agreement were 10% of MSRP on international sales; 50% of MSRP for Tinn's direct domestic sales not distributed by OAHN; 5% of MSRP on units sold to OAHN; a 60% margin for any new dealers; exclusive distributorship of EMM products in the United States if OAHN was not acting as such; and "40% commission on e-commerce." *Id.* at 4.

    *d.*    *October 17, 2008: Supplemental Response to EMM's Request for Admissions*

In this supplemental response, dated October 17, 2008, EMM asked Tinn to admit that he knew of no written agreement in this matter providing for an initial term of two years, automatic renewal of said agreement upon meeting a minimum sales threshold of one hundred units, automatic renewal of said agreement upon meeting a minimum sales threshold of one hundred and fifty units, or Tinn's entitlement to 10% of MSRP for sales by international distributors. Tinn admitted that he knew of no written agreement to that effect.

### Legal Standard

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c) (2008). Summary judgment is not proper if material factual issues exist for trial. *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995).

OPINION AND ORDER        8        {KPR}

The moving party has the burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party shows the absence of a genuine issue of material fact, the non-moving party must go beyond the pleadings and identify facts which show a genuine issue for trial. *Id.* at 324. A nonmoving party cannot defeat summary judgment by relying on the allegations in the complaint, or with unsupported conjecture or conclusory statements. *Hernandez v. Spacelabs Medical, Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003). Thus, summary judgment should be entered against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

The court must view the evidence in the light most favorable to the nonmoving party. *Bell v. Cameron Meadows Land Co.*, 669 F.2d 1278, 1284 (9th Cir. 1982). All reasonable doubt as to the existence of a genuine issue of fact should be resolved against the moving party. *Hector v. Wiens*, 533 F.2d 429, 432 (9th Cir. 1976). Where different ultimate inferences may be drawn, summary judgment is inappropriate. *Sankovich v. Life Ins. Co. of North America*, 638 F.2d 136, 140 (9th Cir. 1981).

However, deference to the nonmoving party has limits. The nonmoving party must set forth "specific facts showing a *genuine* issue for trial." FED. R. CIV. P. 56(e) (2008) (emphasis added). The "mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Therefore, where "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotations marks omitted).

OPINION AND ORDER                    9                    {KPR}

*Discussion*

1.    <u>The Alleged Oral Agreement</u>

   *a.    Standards*

Oregon subscribes to the objective theory of contracts. *Real Estate Loan Fund v. Hevner,* 76 Or. App. 349, 354, 709 P.2d 727 (1985). "In determining whether a contract exists and what its terms are, we examine the parties' objective manifestations of intent, as evidenced by their communications and acts." *Ken Hood Constr. v. Pacific Coast Constr.,* 201 Or. App. 568, 578, 120 P.3d 6 (2005), *adhered as modified on reconsideration by* 203 Or. App. 768, *rev. denied,* 341 Or. 366 (2006). Thus, the determination of whether a contract exists "does not depend on whether the parties had the same subjective understanding of their agreement . . . it depends on whether the parties agreed to the same, express terms of the agreement, and on whether those terms constitute an enforceable agreement." *City of Canby v. Rinkes,* 136 Or. App. 602, 611, 902 P.2d 605 (1995), *rev. denied,* 322 Or. 489 (1996); *accord Vanderselt v. Pope*, 155 Or. App. 334, 339, 963 P.2d 130 (1998) (meeting of the minds measured by both parties' objective manifestations of intent to form a contract).

For an agreement to constitute an enforceable contract, the parties must agree on the terms of the agreement. As the Oregon Supreme Court wrote, "This court, in a long line of cases, has adhered to the rule that before there can be a valid contract there must be a meeting of the minds as to all of its terms; that nothing can be left for future negotiation, and that if any portion of the contract is not agreed upon, or if no method is agreed upon by which such a term or provision can be settled, there is no contract." *Phillips v. Johnson*, 266 Or. 544, 555, 514 P.2d 1337 (1973). This rule has been refined to require the parties' agree only on essential or material terms of the

OPINION AND ORDER                    10                    {KPR}

agreement. *See Hand v. Starr-Wood Cardiac Group of Corvallis*, No. 99-1091-JO, 2001 U.S. Dist.

LEXIS, at *7 (D. Or. Feb. 15, 2001) ("It is well-settled in Oregon that the parties need not agree on

all terms of the contract, but only those that are essential to the agreement." (citing *Pacificorp v.*

*Lakeview Power Co.*, 131 Or. App. 301, 307, 884 P.2d 897 (1994))).  "A term is 'material' to an

enforceable agreement when it goes to the substance of the contract and, if breached, defeats the

object of the parties in entering into the agreement." *Johnstone v. Zimmer*, 191 Or. App. 26, 34, 81

P.3d 92 (2003).

> The burden is on the party alleging the contract's existence to establish its terms:
>
> the proponent of the alleged contract, has the burden of establishing its existence and
> its terms.  In order to warrant enforcement, proof of the contract must be clear,
> unequivocal and by a preponderance of the evidence.  In determining whether a
> contract exists and what its terms are, we examine the objective manifestations of
> intent, as evidenced by the parties' communications and acts.

*Holdner v. Holdner*, 176 Or. App. 111, 120, 29 P.3d 1199 (2001) (internal citations and quotation

marks omitted).  When the facts are not in dispute, the determination of whether a contract exists is

a question of law. *Key West Retaining Sys., Inc. v. Holm II, Inc.*, 185 Or. App. 182, 188, 59 P.3d

1280 (2002), *rev. denied,* 335 Or. 402 (2003).

> b.      *The parties' positions*

EMM argues that Tinn has not presented evidence of a set of clear and unequivocal essential

terms agreed upon by the parties as evidenced by their objective manifestations of intent.  Rather,

his contradictory and inconsistent testimony demonstrates not only that the parties did not agree on

the specific material terms, but that Tinn himself cannot accurately state the essential terms that he

alleges were part of the parties' oral agreement.  Further, EMM argues, because there is no

documentary evidence of this agreement, the court must base any finding of an enforceable oral

OPINION AND ORDER                          11                          {KPR}

agreement on Tinn's testimony and recollection of terms. For this reason, even taking Tinn's assertions as true and drawing inferences in his favor, no reasonable juror could find the existence of an enforceable oral agreement consistent with Tinn's alleged terms, let alone that there is objective evidence that EMM knew of and wished to be bound by Tinn's terms.

Tinn claims that EMM concedes it entered into an agreement with Tinn in October 2005 and, because both parties performed under this agreement, there is no genuine issue as to the agreement's existence. He further asserts that the evidence demonstrates at least a genuine issue as to whether there was a breach of this agreement and that, at most, he is entitled to summary judgment on the issue of liability for EMM's breach of contract.

    *c.*     *Analysis*

As the proponent of the agreement, Tinn has not met his burden of demonstrating that sufficient facts exist upon which reasonable jurors could find clear and unequivocal proof, by a preponderance of the evidence, that an oral contract existed. Tinn maintains that the parties entered into a binding oral agreement in October 2005, but his own testimony shows they could not have. Tinn gave varying descriptions of the terms of the oral agreement he claims to have struck with EMM in October 2005. At his June 25, 2008, deposition, Tinn testified to these terms and subsequently memorialized this testimony in his July 15, 2008, Amended Response to Defendant's Interrogatory No. 1 (hereinafter "Amended Response"). But as EMM correctly points out, these terms are in conflict with the terms contained in the draft agreement (hereinafter "Draft Agreement") that Tinn said, in his May 19, 2008, response to EMM's Interrogatory No. 1 (Weiss Decl. Ex. 3 at 2; Weiss Decl. Ex. 4), constituted the oral contract.

A comparison of the two documents fatally undermines the notion that the parties ever could

OPINION AND ORDER          12          {KPR}

have reached agreement.  The Draft Agreement stated that the contract term began on October 31, 2005, and ran for fourteen months, ending on December 31, 2006.  The Amended Response stipulated a two-year term not to begin until EMM released its CDSA Single Box Player, for which event no date was specified.  The Draft Agreement stated that the agreement was governed by the laws of Alberta, Canada, but the Amended Response stated that the agreement was governed by Oregon law.  The Draft Agreement provided commissions of 5% of EMM's suggested retail price on international sales both before and after termination of EMM's contract with OAHN, but the Amended Response set the commission on international sales at 10% of MSRP.  The Draft Agreement provided for 5% commission on sales in the United States, both before and after termination of EMM's contract with OAHN, but the Amended Response set this commission at 10% of MSRP.  Under the Draft Agreement, Tinn was entitled to 35% of EMM's suggested retail price on internet sales; the Amended response, by contrast, provided a 40% commission for "e-commerce."  Under the Draft Agreement sales benchmarks required for renewal were set to increase every year:  at the end of 2006, Tinn was to have purchased or sold "all of the complete 'Sets' available from the current 'Signature Production Run';" at the end of 2007, Tinn was to have purchased or sold 250 CDSA units (no less than ten per month); and at the end of 2008, Tinn was to have purchased or sold no less than 350 CDSA units (no less than fifteen per month).  The Amended Response, however, stated that Tinn's sales thresholds were set only generally at between 100 and 150 units per year, with no mention at all of a graduated increase.

Other discovery responses add to the confusion of what terms the parties allegedly agreed upon.  In his May 19, 2008, answer to Interrogatory No. 1, which was his original answer to this interrogatory, Tinn said the terms of the oral agreement were contained in "the draft agreement

immediately preceding" a June 28, 2006, e-mail Meitner sent to EMM's lawyer but which, Tinn said, contained a lower commission than he had orally agreed to because of EMM's alleged fraud. However, in his October 17, 2008, supplemental responses to EMM's requests for admission, Tinn admitted that none of the numerous draft agreements contained any of five key terms he claimed were part of the oral agreement. (Weiss Decl. Ex. 5 at 2-3.) This, despite Tinn's June 25, 2008, unequivocal deposition testimony that he was "confident" that at some point he looked at a draft agreement containing the terms he believed he had agreed to with EMM. (Weiss Decl. Ex. 1 at 4-5.) Also, Tinn testified that the parties communicated that they would only enter into an agreement in writing, *id.* at 26-27, and the parties do not dispute that no written agreement ever was made.

As the above discrepancies illustrate, Tinn cannot meet his burden on summary judgment. The court's conclusion in *Mukai Living Trust v. Lopez*, 199 Or. App. 341, 111 P.3d 1150 (2005) applies with equal force here: "In the present case, nothing in the summary judgment record amounts to evidence from which a rational juror could find that the parties entered into an agreement with terms 'so precise that neither could reasonably misunderstand them.'" *Id.* at 345 (citation omitted). In this case, no rational juror could find a meeting of the minds on the terms of the alleged oral contract because Tinn himself has not been of one mind about what those terms were. Furthermore, Tinn testified that both he and EMM did not intend to be bound to any agreement without a written contract; given that unrefuted testimony, a rational juror could not find that the parties reached an oral agreement.

Thus, Tinn's conflicting testimony about the oral contract's terms is not a basis upon which he may create a question of fact to survive summary judgment. Both parties acknowledge the rule that a litigant cannot create a genuine issue of material fact by contradicting prior sworn testimony

OPINION AND ORDER                    14                    {KPR}

without explanation.  The rule, which obtains "virtual unanimity" among the circuit courts, is that "a party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous sworn statement (by, say, filing a later affidavit that flatly contradicts that party's earlier sworn deposition) without explaining the contradiction or attempting to resolve the disparity."  *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 806 (1999).  The Ninth Circuit explained:

> a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony.  'If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact.'

*Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 266 (9th Cir. 1991) (internal citations omitted) (quoting *Foster v. Arcata Associates*, 772 F.2d 1453, 1462 (9th Cir. 1985), *cert. denied*, 475 U.S. 1048 (1986)).  This rule does not extend to cases "in which a contradictory affidavit is introduced to explain portions of earlier deposition testimony.  Rather, [the rule is] concerned with 'sham' testimony that flatly contradicts earlier testimony in an attempt to 'create' an issue of fact and avoid summary judgment."  *Kennedy*, 952 F.2d at 267.  On summary judgment, it is for the district court to determine whether the contradictory testimony was given in an honest effort to clarify, or was an intentional alteration designed to create a genuine issue of material fact.

Here, Tinn's testimony presented two diverging sets of contract terms.  Important to the instant issue, he does not explain the many material discrepancies between his June 2008 deposition description of the contract terms and his May 2008 interrogatory description of those terms.  Nor has Tinn explained the contradiction between these conflicting accounts of an oral agreement and his unequivocal deposition testimony that both he and EMM affirmatively had stated to each other that

no agreement between them would be made unless it was in writing. (Weiss Decl. Ex. 1 at 26-27.) Tinn's deposition testimony on this point is consistent with Meitner's contemporaneous e-mail statements to Tinn that no agreement existed between them (*see* Meitner Decl. Ex. 5 at 1 ("At the present there is no written or verbal agreement with EMM Labs."); Meitner Decl. Exs. 3-4 (indicating the parties have no contract and no agreement)), statements which Tinn did not refute at the time and did not refute on summary judgment.

Tinn repeatedly urges the court to look at the parties' performance as evidence of their mutual intent to be bound, but this argument is unavailing because, as noted above, Tinn gave unequivocal deposition testimony that both he and EMM stated their express intent that there would be no agreement between them without a written document containing all the terms to their agreement. This intent to be bound only upon a signed agreement is a critical principle in Oregon contract law:

> In cases such as this one where the parties to an alleged oral contract contemplate the later execution of a written agreement, the initial question in determining the existence of a contract is whether or not the parties intended to be bound and regarded the contemplated written agreement as a memorial of a prior contract, or whether they intended only to be bound upon the execution of a written, signed contract.

*Pyle v. The Wolf Corporation, et al.,* 354 F. Supp. 346, 352 (D. Or. 1972) (internal citations omitted). Here, it is clear that both Tinn and EMM, as Tinn himself testified, intended to be bound only with a signed written agreement. The parties' exchange of numerous written drafts reaffirms Tinn's deposition testimony; the written agreement was not intended to be a simple memorialization of a prior oral agreement but instead was to *be* the parties' agreement, without which neither party intended to be bound.

For these reasons, Tinn has failed to produce sufficient evidence of the existence of an oral

agreement with EMM that allows him to survive summary judgment on his breach of contract claim.

2.    The Statute of Frauds

Alternatively, Tinn's oral contract claim is barred by Oregon's statute of frauds.  The statute provides that "an agreement that by its terms is not to be performed within a year from the making," is void unless it is in writing.  OR. REV. STAT. 41.580(1)(a) (2007).  Because Tinn contends that the oral agreement was for an initial term of two years, the agreement is unenforceable under the statute of frauds.[2]

Tinn counters that the doctrine of part performance takes the agreement out of the statute of frauds and the agreement is therefore enforceable.  Part performance is an equitable doctrine with three requirements:

> First, the party asserting part performance must provide preponderating evidence of an agreement that is clear, certain and unambiguous in its terms.  Second, that party must produce evidence of conduct clearly and unequivocally referable to the oral agreement, that is, conduct that is explainable only on the ground that it was performed as part of the contractual *quid pro quo* and not for some other reason unrelated to the agreement.  Last, there must be equitable grounds for enforcing the agreement.

*Mukai Living Trust*, 199 Or. App. at 345 (internal quotation marks and citations omitted) (emphasis in original).  Tinn has not presented evidence that creates a genuine issue of material fact on the first element of the part performance exception.  Tinn's own testimony about the alleged agreement's terms is conflicting, thus preventing him from presenting evidence of an agreement that is "clear, certain and unambiguous in its terms."  Without such evidence, no rational jury could find that the parties' conduct was "referable" to an oral agreement of clear, certain, and unambiguous terms.  For

---

[2]  The statute of frauds still would bar Tinn's claim under his initial iteration of the alleged oral contract, which was to be for a term of fourteen months.

OPINION AND ORDER                    17                    {KPR}

this additional reason, summary judgment in favor of EMM on Tinn's breach of contract claim is appropriate.[3]

3.    Estoppel

Tinn argues that EMM should be estopped from asserting a statute of frauds defense. Estoppel will bar operation of the statute of frauds when "'one [against whom the statute is asserted] has acted to his detriment solely in reliance on an oral agreement[.]' . . . Unlike part performance, conduct that constitutes reliance need not be unequivocally referrable to the oral agreement." *Angel v. Reider*, 71 Or. App. 10, 13-14, 691 P.2d 151 (1984) (quoting *Engelcke v. Stoehsler*, 273 Or. 937, 944, 544 P.2d 582 (1975)) (additional citations omitted).   Courts differ on whether or not the estoppel doctrine is subsumed by the part performance exception to the statute of frauds or if it stands alone.   *Compare Siegner v. Interstate Production Credit Association of Spokane*, 109 Or. App. 417, 432, 820 P.2d 20 (describing the part performance exception and observing, "[a]dditionally, in an action at law, a party may be estopped, in appropriate circumstances, from asserting the Statute of Frauds."); *with Lemley v. Lemley*, 221 Or. App. 172, 186 n.9, 188 P.3d 468 (2008) ("Plaintiff urges us to consider whether the agreement is also enforceable under the doctrine of equitable estoppel.   That doctrine is subsumed by the part performance exception, and we therefore do not give it separate consideration.").

Regardless of whether estoppel is subsumed within or independent from the part performance doctrine, Tinn's estoppel argument fails because he never pleaded estoppel and never raised the issue until his response to EMM's summary judgment motion.   Estoppel is an affirmative defense that

---

[3] EMM also cites Oregon's UCC statute of frauds, ORS 72.2010, in support of its argument. However, the UCC version applies only to the sale of goods priced over $500, and the alleged contract at issue here is for personal services.   Therefore, the UCC statute of frauds does not apply.

must be pleaded or is waived.  FED. R. CIV. P. (c)(1); *In re Adbox, Inc.*, 488 F.3d 836, 841-42 (9th Cir. 2007) ("Federal Rule of Civil Procedure 8(a) and (c) provide that a defendant's failure to raise an 'affirmative defense' in his answer effects a waiver of that defense. *See Morrison v. Mahoney,* 399 F.3d 1042, 1046 (9th Cir. 2005); 5 CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, *Federal Practice & Procedure* § 1278 (2d ed.1990).").  Second, assuming without deciding that estoppel is a separate doctrine from part performance, Tinn cannot invoke this equitable doctrine because he has not established, sufficient to survive summary judgment, the existence of an oral agreement upon which he could have relied.  For these reasons, Tinn's equitable estoppel defense fails and is not a bar to granting summary judgment in favor of EMM.

4.    Quantum Meruit

In its opposition to Tinn's summary judgment motion, EMM argued that Tinn's claim against it really is one for the value of services he rendered to EMM.  EMM quoted the Oregon Supreme Court in support of this proposition:  "A verbal contract to do work which, by its terms, is not to be performed within one year, is void; but, if the parties treat it as valid until after a part of the work is done, it cannot then be avoided so as to avoid payment of the reasonable value of the work that has been performed." *McGilchrist v. F.W. Woolworth Co.*, 138 Or. 679, 685-686, 7 P.2d 982 (1932). EMM asserted that Tinn's recovery would be limited to the reasonable value of the work that he actually performed, but "[b]ecause there is no evidence that he has not already received adequate compensation for the work he did, summary judgment on liability is inappropriate."  (Def.'s Opp. Brief ("Br.") 12.)  At hearing EMM's counsel reiterated this position and observed that while EMM did not oppose Tinn seeking compensation for the value of services he rendered during the parties' business relationship, he was not aware that Tinn was owed any amounts for those services because

EMM had paid Tinn during their business relationship.

A claim for *quantum meruit* is a quasi-contractual claim. *Robinowitz v. Pozzi,* 127 Or. App. 464, 467, 872 P.2d 993, *rev. den.,* 320 Or. 109 (1994). "The elements of the claim are a benefit conferred, awareness by the recipient that a benefit has been received, and judicial recognition that, under the circumstances, it would be unjust to allow retention of the benefit without requiring the recipient to pay for it." *Safeport, Inc. v. Equipment Roundup & Mfg., Inc.*, 184 Or. App. 690, 706, 60 P.3d 1076 (2002) (citing *Jaqua v. Nike, Inc.,* 125 Or. App. 294, 298, 865 P.2d 442 (1993)).

Neither Tinn nor EMM directly discussed whether Tinn may maintain a claim for quantum meruit. While the record contains evidence that EMM paid Tinn during their business relationship, it is unclear whether or not Tinn has received all compensation owed to him for the services he performed during the time period in question. To the extent that Tinn may not have received payment for any part of the services he rendered during the parties' business relationship, Tinn may proceed on a quantum meruit theory to obtain recovery of any such unpaid amounts.[4]

5.    EMM's Lanham Act Counterclaim

Tinn moves for summary judgment on EMM's false association and false advertising counterclaims on the ground that EMM has produced insufficient evidence to create a genuine issue of material fact as to Tinn's liability under these claims.

a.    *False advertising*

As a preliminary matter, EMM stated that it "does not intend to pursue a separate claim for

---

[4] Although Tinn survives EMM's summary judgment motion for the limited purpose of pursuing a quantum meruit theory, he must rely on the evidence he has obtained during the discovery phase of the case. The court will not permit additional discovery on this theory, as prior to the close of discovery in this case the parties vigorously engaged in extensive discovery, including on the subject of Tinn's potential damages.

OPINION AND ORDER                    20                    {KPR}

false advertising," but that instead the "gravamen" of its Lanham Act claim is false association under 15 U.S.C. § 1125(a)(1)(A). (Def.'s Opp. Br. 19.) Therefore, to the extent that EMM has asserted a Lanham Act counterclaim in part based on false advertising, Tinn's motion for summary judgment is granted. Accordingly, the court turns to EMM's false association allegation.

  *b.*  *False association*

  A cause of action for false association under the Lanham Act is governed by 15 U.S.C. § 1125(a)(1)(A), which reads:

> Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which [] is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person . . . shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1)(A) (2008).

  EMM alleges that, subsequent to the termination of his relationship with EMM, "Tinn extensively used the EMM [L]abs name and mark in connection with websites promoting his services and products in a manner that falsely suggested that he was an authorized distributor of EMM [p]roducts, or was associated or affiliated with EMM in some way." (Def.'s Answer, May 5, 2008, at 6.) According to EMM, Tinn's use of EMM's name and mark violated the Lanham Act.

  In his motion, Tinn asserts that EMM lacks evidence to establish necessary elements of this claim sufficient to survive summary judgment. In particular, Tinn argues that EMM cannot establish, as a result of an outdated reference to EMM Labs on two of Tinn's business websites, that a single sale of new or used EMM equipment took place or that EMM has been or is likely to be

OPINION AND ORDER    21    {KPR}

damaged by this reference.

EMM responds that its evidence demonstrates that Tinn held himself out as an authorized dealer of EMM products and this is sufficient evidence of false association. In support, EMM cites e-mails between Tinn and consumers exchanged after the parties' relationship ended, wherein the consumers inquire about EMM products. Also, EMM maintains, evidence of damages is not necessary to state a claim for false association, and a finding of liability for false association is permissible even where it gives rise to only nominal damages.

<u>i.</u>    Liability for false association

Liability for false association may arise where the defendant has "use[d] trademarks in a manner likely to cause the public to believe that the defendant is a participant in the trademark holder's authorized sales network." *Fender Musical Instruments Corp. v. Unlimited Music Center, Inc.*, No. 93CV-2449, 1995 U.S. Dist. LEXIS, at *12 (D. Conn. Feb. 16, 1995) (citing *H.L. Hayden Co. of N.Y., Inc. v. Siemens Medical Sys., Inc.,* 879 F.2d 1005, 1023 (2nd Cir. 1989)). EMM has submitted evidence sufficient to create a genuine issue of fact as to whether customers did or were likely to incorrectly believe that Tinn was an authorized dealer of EMM products long after Tinn's association with EMM had ceased.

The parties do not dispute that Tinn's two websites, bluelightaudio.com and chambersaudio.com, contained references to EMM after the parties' business relationship ended. The question is whether these references were likely to cause confusion, and EMM's evidence creates a question of fact on that issue. EMM submitted several e-mails between Tinn and persons who sought to buy or were considering buying EMM products, which e-mails Tinn received after his relationship with EMM terminated. First, and importantly, EMM submitted an April 2, 2007,

OPINION AND ORDER                    22                    {KPR}

e-mail from Meitner to Tinn which states: "At this time I must respectfully ask you to remove EMM Labs from your website as it creates the false impression you are an authorized dealer for EMM." (Def.'s Opp. Ex. 3 at 51.)  This e-mail put Tinn on notice that he still was associating his personal business enterprises with EMM products and that EMM objected to this because it was creating a "false impression."

Second, regarding customer impressions, EMM submitted e-mails from potential customers who questioned Tinn about EMM products, to which Tinn either failed to respond or responded in a way that did not clarify that his relationship with EMM had ended.  On March 14, 2008, a man in Norway wrote: "I've just viewed your web site, and one thing puzzles me:  In "Product lines," Emm [sic] is in BOLD, as if you no longer carry Emm Labs. . . .  Do you now consider Emm not to be good?  I thought you also were on the board in the Emm company?!" (Def.'s Opp. Ex. 3 at 59.)  On May 3, 2008, Tinn wrote to another customer that upon comparison with EMM products, Tinn's own product line, Playback Designs, "[was] substantially better sounding in so many ways," than the EMM product.  (Def.'s Opp. Ex. 3 at 65.)  This e-mail neither disclosed that Tinn no longer was an authorized dealer of EMM products nor that he was the owner of the company that made the product he endorsed to this potential EMM customer.  And, on May 13, 2008, Tinn replied by e-mail to a potential EMM customer that "EMM Labs [sic] higher price does not reflect any performance increase at all. . . .  [D]o not waste your money." (Def.'s Opp. Ex. 3 at 62.)  Other e-mails EMM submitted show similar inquiries and responses.

Taken together, the continued references to EMM on Tinn's websites, Tinn's failure to respond to potential customers' inquiries, his failure to clarify his relationship with EMM, and his affirmative attempts to steer potential EMM customers to his own product line create a genuine issue

of material fact as to whether Tinn falsely associated himself with EMM's mark, in commerce, such as to cause confusion about his affiliation with EMM. Therefore, summary judgment on this claim is inappropriate and Tinn's motion is denied.

ii.    Damages arising from false association

The Ninth Circuit recognizes that legal damage, as opposed to actual damage giving rise to an award of damages, is cognizable under the Lanham Act. *See Star-Kist Foods, Inc. v. P.J. Rhodes & Co.*, 735 F.2d 346, 349 (9th Cir. 1984) ("The lack of any actual damage requirement renders irrelevant Rhodes's argument that Star-Kist can, at most, suffer only nominal damages . . . Even if true, that claim ignores the fact that a party can still have a reasonable belief that he will be legally damaged."); *see also Neal v. Thompson*, 325 F.2d 978, 984 (9th Cir. 1963) ("Either there had been such actionable misappropriation, or there had not been. If the former, no matter how slight, a cause of action existed. If the damage was so slight as to be de minimis, that rule would justify either a judgment for defendant, or more preferably (because more accurate), an award of nominal damages, such as one dollar or one cent."). Therefore, the court finds that proof of actual damages is not necessary for EMM to present its false association claim under the Lanham Act for determination in this court. For this additional reason, Tinn's motion for summary judgment on EMM's counterclaim for false association is denied.

6.    Tinn's Motion to Amend Complaint

By motion filed November 5, 2008, Tinn seeks leave to amend his complaint for the third time, on this occasion to "specify that EMM was obligated to produce and ship enough units of product to allow Tinn to perform under the contract." (Pl.'s Br. 1.) EMM opposes Tinn's motion, arguing that this new term of the alleged contract was never mentioned in his prior complaints or

disclosed during discovery, and both the discovery and dispositive motions deadlines passed before Tinn filed his motion. (Def.'s Opp. 1-2.)

Tinn made his request after the September 26, 2008, discovery closure date, the last of several extended dates granted at one or both parties' request. Both Tinn and EMM filed summary judgment motions on October 27, 2008, the dispositive motions deadline. Since commencing his suit in June 2007, Tinn has amended his original complaint twice to add to or change his allegations of the terms of the alleged oral agreement with EMM. Tinn filed his second amended complaint on October 29, 2008, exactly one week before filing this motion to amend his complaint a third time.

Tinn's motion to amend is untimely under both Federal Rules of Civil Procedure 15 and 16. A brief review of the proceedings is important context for this conclusion. In the sixteen months between the June 29, 2007, filing date and the October 27, 2008, dispositive motion deadline, the parties vigorously litigated the existence and terms of the alleged oral agreement. Central to this activity were EMM's efforts to commit Tinn to a comprehensive and all-inclusive list of terms contained in the alleged oral agreement. These efforts led to both discovery disputes and motions to compel. Ultimately, the court resolved those issues and when discovery closed, both parties moved for summary judgment. Tinn moved to establish EMM's liability for breach of the alleged oral agreement and EMM moved to establish that no oral agreement existed.

Tinn's request to now add another material term to his alleged oral agreement is denied for two reasons. First, it is untimely, as it comes well after discovery closed and even after the dispositive motion deadline has passed. Generally, Rule 15 governs amendments to pleadings, and it states in relevant part that where a party has already been served with a responsive pleading, "a party may amend its pleading only with the opposing party's written consent or the court's leave.

The court should freely give leave when justice so requires." FED. R. CIV. P. 15(a)(1)-(2) (2007). The court recognizes that a liberal standard is applied to motions for leave to amend. *AmerisourceBergen Co. v. Dialysist West, Inc.*, 465 F.3d 946, 951 (9th Cir. 2006). Even so, "a district court need not grant leave to amend where the amendment: (1) prejudices the opposing party; (2) is sought in bad faith; (3) produces an undue delay in litigation; or (4) is futile." *Id.*

Where, however, the court-ordered deadline for amendments to pleadings has passed, a request to amend a pleading first requires the court to determine whether its scheduling order should be modified. In those instances, Rule 16 governs. Rule 16 states that "[a] schedule may be modified only for good cause and with the judge's consent." FED. R. CIV. P. 16(b)(4) (2008). Thus, "[a] party seeking to amend a pleading after a scheduling order has been entered pursuant to Federal Rule of Civil Procedure 16(b) must first show 'good cause' for amending the scheduling order before the court considers whether the amendment satisfies the requirements of Rule 15(a)." *Ashby v. Farmers Ins. Co.*, No. 01-CV-1446-BR, 2007 U.S. Dist. LEXIS 97502, at *4 (D. Or. Sept. 26, 2007) (citing *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 608 (9th Cir. 1992)). This district's local rules further provide that "objections to any court-imposed deadline must be raised by motion and must: (1) [S]how good cause why the deadlines should be modified[;] (2) Show effective prior use of time; (3) Recommend a new date for the deadline in question[; and] (4) Show the impact of the proposed extension upon other existing deadlines, settings, or schedules." *District of Oregon, Local Rules of Civil Practice* 16.3(a) (2006).

Tinn has not shown good cause why the court's scheduling order should be modified to allow him to amend his complaint a third time. He already has amended his original complaint twice prior to the discovery and dispositive motion deadlines, and he offers no explanation for why he did not

OPINION AND ORDER                          26                          {KPR}

include this specific allegation in his three previous complaints or why he did not identify this new term in response to EMM's interrogatories or at deposition. Moreover, Tinn provides neither explanation for why, after the dates were set at the April 7, 2008, scheduling conference, he could not have included his proposed allegation in his first two amended complaints, nor does Tinn address how his amendment justifies modification of the court's April 7, 2008, scheduling order.

Second, if allowed, the amendment would prejudice EMM or, alternatively, would delay the case. The court disagrees with Tinn's contention that the term he seeks to add to his complaint is something that "goes without saying," because it does not. To the contrary, Tinn seeks to add a significant and material term, namely that EMM was legally obligated, to Tinn personally, to manufacture and ship at least 300 units of EMM's CDSA Single Box Player, an expensive, high-end audio component, beginning on a specific date. This allegation differs substantially from that contained in Tinn's Second Amended Complaint, wherein he listed the CDSA Single Box Player as one of five EMM audio components for which he would be the exclusive distributor, with no reference to a start date and no allegation that EMM was obligated to him to manufacture or to continue production of these products. (Second Amended Complaint at 2-3.) In essence, Tinn's proposed amendment would convert a condition precedent which, if it failed to occur, would relieve him of the duty to meet certain specified sales quotas into a contract obligation on EMM which, if not met, would give Tinn a potential claim for damages against EMM. Allowing Tinn to add this allegation at this stage of the case would prejudice EMM because EMM did not have the opportunity to conduct discovery on this very different contention. The alternative, reopening discovery to permit EMM to conduct discovery on this allegation, is equally unacceptable, as it would delay this case, which already is twenty months old, and undoubtedly prompt another round of dispositive

motions from both sides.

In sum, Tinn's motion to amend his complaint is untimely, would cause prejudice or delay, and, on this record, is not supported by good cause. Accordingly, his motion to amend is denied.

*Conclusion*

EMM's motion (#149) for summary judgment against Tinn's breach of oral agreement claim is GRANTED. EMM's alternative motion for an order precluding Tinn from recovering damages for future profits and profits on sales not actually made is DENIED as moot. Tinn's motion (#144) for partial summary judgment on liability is also DENIED as moot. However, the court will permit Tinn to proceed on a quantum meruit theory to recover the compensation, if any, EMM did not pay to him for the services and sales he performed for EMM's benefit during the period of their business relationship. Tinn's motion for summary judgment against EMM's Lanham Act counterclaim is GRANTED as to the allegation of false advertising but DENIED as to the allegation of false association. Finally, Tinn's motion to amend his complaint is DENIED as untimely.

DATED this 27th day of February, 2009.

JOHN V. ACOSTA
United States Magistrate Judge